Filed 8/20/15  P. v. Nash CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C076359 |
| Plaintiff and Respondent, | (Super. Ct. No. 12F3778) |
| v. | |
| CODY WILLIAM NASH, | |
| Defendant and Appellant. | |

Defendant Cody William Nash brutally stabbed his aunt and uncle, fatally wounding his aunt and leaving his uncle in a condition where he requires 24-hour care. As to his aunt's killing, the People charged him with first degree murder, and his defense was that he suffered delusions and hallucinations from schizophrenia, making the killing involuntary manslaughter. The court instructed that mental illness can negate the elements of premeditation and deliberation and lying in wait. The jury rejected the defense and found defendant guilty of first degree murder with a special circumstance of lying in wait and a finding he used a deadly weapon, guilty of attempted premeditated

1

murder with a finding that he committed great bodily injury, and guilty of assault with a deadly weapon. The court sentenced him to an indeterminate term of life in prison without the possibility of parole for the murder, an indeterminate term of life in prison for the attempted murder, along with a determinate term of five years in prison.

On appeal, defendant raises six contentions addressing the instructions, defense counsel's performance, cumulative error, sentencing and the abstract of judgment. Finding merit in defendant's sentencing argument and an error in the abstract of judgment, we modify the sentence, affirm the judgment as modified, and direct the trial court to correct the abstract of judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A

*The Prosecution's Case*

In June 2012, Lynn Robert Watson and his wife, Candace Watson, were living at their home in Redding when defendant came to visit. Defendant was the son of Candace Watson's brother. Candace Watson had picked defendant up in Red Bluff, and when they got home, the three of them ate dinner together, watched television, and played with their dogs.

Lynn Watson woke up the next morning (June 8, 2012) and showered. When he got out of the shower, he heard his wife yell, " 'Oh, no.' " He went into one of the bedrooms and saw his wife face down on the bed and defendant standing next to her with two knives. Lynn Watson yelled, "What the hell is this," and defendant shoved him out of the way and hit his aunt. Defendant began attacking his uncle, cutting his face, his vocal cords, and the tendons in his arms.

Eventually, Lynn Watson made his way across the street to a neighbor's house, where the neighbor called 911 at around 5:30 a.m.. Lynn Watson was taken to the hospital, at which time he had no detectable blood pressure or vital signs. His neck and

2

trachea had been severely cut. Lynn Watson now needs 24-hour care and cannot live alone.

Police found Candace Watson dead in her house. She had a "ghastly wound" to her neck that ran earlobe to earlobe, measuring nine and one-half inches. Her trachea and the large muscles in her neck had been completely severed. Her jugular vein had been perforated with a slit-like wound. Her cervical vertebrae in her neck that went around her spinal cord was partially sliced. There were scattered bruises around her head and the rest of her body.

Police also found defendant inside the house on the floor of the sewing room and handcuffed him. Police asked him his name. He did not respond. Police asked him where he lived, and he said "Oregon." Police asked what he was doing in Redding, and he said, "camping." Police asked to whom the house belonged, and he said, "his aunt and uncle." Police asked him what happened inside the house, and he said "he didn't know." Defendant's answers were straightforward, and he did not talk about seeing things or hearing voices. Defendant did not act like he was intoxicated or smell of alcohol. When police directed him to sit in the back of the patrol car, defendant repeatedly vomited a "red clear liquid."

Police interviewed defendant three times -- twice on the day of the stabbings and once two days later.

The first interview was at 7:00 a.m. at the hospital. Defendant said he had taken the Greyhound bus from Oregon to Redding to repay a loan from one of his cousins and to see his aunt and uncle. He had been feeling suicidal for about a year and had three bottles of Robitussin with him that he thought he could use to commit suicide. At his aunt and uncle's house after they had gone to sleep, he drank the three bottles of Robitussin. He had a cut on his hand, but he had no idea how he got it, and he had no idea where his aunt and uncle were right now. There was "all kinds of crazy stuff going on in [his] head now." When asked if he was hearing voices, he said, "It's just empty."

3

He was lying down in the family room after taking the Robitussin, fell asleep, and recalled the cops waking him up in the study. He was in a room with people cleaning up, and there was blood everywhere. When asked if he remembered getting a knife from the house, defendant responded, "I'm not gonna talk about any of that." He was "not in a state currently to give . . . any sort of recollection." He remembered "feeling extraordinarily hot and extraordinarily angry." He remembered getting a knife, and he remembered being "totally ready" "to do it." He must have done something to his aunt and uncle that he was "gonna try to do to [him]self."

The second interview was at the police investigation unit at 12:49 p.m., five hours after he stabbed his aunt and uncle. Defendant said he "hear[s] voices" that "push [him] to kill [him]self " and hurt other people that are like "competing interests," "like one side's saying this and" "one side's saying that." When asked if he "hear[d] any voices during . . . this incident or was it more just the impulses," defendant responded, "It was just impulse." He "can remember killing two people like they were animals." He was "high" at the time and was "insane" from drinking. He had swallowed one bottle of Robitussin and some alcohol. He found his uncle in the house and yelled (falsely) at him that he beat his kids, which defendant thinks was displacement of the rage he felt toward his dad (who had beat him). He then followed his aunt into the kitchen, grabbed her hair, and cut her throat. He felt rage when killing his aunt, and his reason for doing it was that it would then make him kill himself. He went to find his uncle, who was in the shower. The bathroom door was locked, so defendant kicked down the door as he heard the shower running. Defendant cut his uncle's throat and then starting yelling at his uncle that he beat his children. Defendant drank more alcohol and the other two bottles of Robitussin.

The third interview was at the Shasta County Jail at 8:00 a.m., two days after the stabbings. Regarding the Greyhound bus journey, defendant had bought three bus tickets with different destinations (Nevada to visit his father, Redding to visit his aunt and uncle,

4

and Los Angeles to visit friends). He initially thought he was going to see his dad to kill him, but then realized it "wasn't the right thing to do." Defendant got off in Red Bluff "for some reason . . . I don't know why." The detective interviewing defendant proposed a thought: defendant went to Red Bluff to address how his aunt and uncle treated him when his grandmother died. Defendant admitted that when his grandmother died when he was 17 years old, his aunt and uncle made him move out of her house immediately (a house in which he had been acting as his grandmother's caretaker) and then refused to release his $10,000 inheritance from her until he was 25 years old. He "must have" come to Redding to "take care of that aggression" he felt toward his aunt and uncle.

B

*The Defense*

Defendant was diagnosed with schizophrenia when he was brought to the jail after the killing. Schizophrenia is defined as the " 'co-occurrence of at least two of the following symptoms: hallucinations, delusions . . . occurring for a significant period of time during a one-month period and associated with continuous problems over at least a six-month period.' " "[H]allucination is where there is a sensory response without a stimuli." "[T]hey hear a voice and there's no one talking to them." "Most commonly it is . . . auditory, hearing things that aren't here; and the second most common is visual, seeing things that aren't there." A delusion is a "fixed false belief," which means that "someone believes something that . . . is not true and continues to believe it despite the amount of evidence presented to them to the contrary." Defendant began taking antipsychotic medication to control his schizophrenia the week after arriving at jail. The medication "g[a]ve [him] mental clarity . . . to calm down [his] impulses."

In January 2012, defendant typed in " 'paranoid hearing voices' " in a Google search engine on his home computer. In February 2012, defendant took a trip to Maryland to apply for a job at a video game company because he falsely believed he had been involved in making a very popular video game named Skyrim. At the time, he was

5

using the name, " 'Cody the Blue' " and falsely believed that Peter Jackson, who was the director of the Lord of the Rings series, had contacted him by phone. In February or March 2012, defendant decided to sleep in his friend's closet, claiming that his own room smelled.

DISCUSSION

I

*The Trial Court Erred In Failing To Instruct The Jury About*
*The Effects Of Hallucination (CALCRIM No. 627) Because There Was*
*Sufficient Evidence Defendant Was Experiencing Hallucinations At The*
*Time Of The Crimes, But The Error Was Harmless*

Defendant contends the trial court erred in refusing his request to instruct the jury pursuant to CALCRIM No. 627, which would have told the jury that it "may consider evidence of hallucinations, if any, in deciding whether the defendant acted with deliberation and premeditation."

A

*The Requested Instruction (CALCRIM No. 627) And The Court's Ruling Refusing It*

The version of CALCRIM No. 627 that defendant proposed, but the court refused, read in full as follows:

"A hallucination is a perception not based on objective reality. In other words, a person has a hallucination when that person believes that he or she is seeing or hearing [or otherwise perceiving] something that is not actually present or happening.

"You may consider evidence of hallucinations, if any, in deciding whether the defendant acted with deliberation and premeditation.

"The People have the burden of proving beyond a reasonable doubt that the defendant acted with deliberation and premeditation. If the People have not met this burden, you must find the defendant not guilty of first degree murder."

6

Defense counsel argued that "circumstantially there's evidence that [defendant] has experienced hallucinations prior to this, and that during the interviews, he uses the word 'impulse' instead of 'voices' or 'visions.' I think that's a matter of semantics, and it can be argued that an impulse can be an auditory hallucination."

The trial court ruled to the contrary, explaining: "And not to trivialize this at all but just to respond . . . , I've had the impulse in my life to eat lots of bowls of ice[]cream, unfortunately, but they were not the result of a voice in my head telling me to do it."

B

*Substantial Evidence Supported Giving CALCRIM No. 627 Regarding Hallucination*

Contrary to the trial court's ruling, there was substantial evidence to give the instruction. (See *People v. Ponce* (1996) 44 Cal.App.4th 1380, 1386 ["a trial judge must only give those instructions which are supported by substantial evidence"].)

Defendant was diagnosed with schizophrenia when he was brought to the jail after the killing, which is defined as the " 'co-occurrence of at least two of the following symptoms: hallucinations, delusions . . . occurring for a significant period of time during a one-month period and associated with continuous problems over at least a six-month period.' "

The schizophrenia diagnosis was supported by evidence of hallucinations in the period encompassing the killing. In January 2012, defendant typed in " 'paranoid hearing voices' " in a Google search engine on his home computer. In February 2012, defendant took a trip to Maryland to apply for a job at a video game company because he falsely believed he had been involved in making a very popular video game. At the time, he was using the name, " 'Cody the Blue' " and falsely believed the director of the Lord of the Rings series had contacted him by phone. In February or March 2012, defendant decided to sleep in his friend's closet, claiming that his own room smelled. When interviewed at the police investigation unit about five hours after he stabbed his aunt and uncle, defendant said he "hear[s] voices" that "push [him] to kill [him]self " and hurt other

7

people that are like "competing interests" "like one side's saying this and" "one side's saying that." When asked if he "hear[d] any voices during . . . this incident or was it more just the impulses," defendant responded, "It was just impulse." However, at trial, he explained that the antipsychotic medication he was taking to control his schizophrenia that he began taking the week after arriving at jail, "g[a]ve [him] mental clarity . . . to calm down [his] impulses." This evidence of hallucinations over a period encompassing the killing (regardless of the term defendant used to describe the hallucinations) was sufficient to support giving the instruction.

C

*The Instructional Error Was Harmless*

The parties disagree as to whether the error should be judged under a state or federal standard of prejudice, but we need not resolve that question, for under either standard the error is harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836 ["a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error"]; *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711] ["before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt"].)

First, the issue of whether mental illness, which included hallucinations, reduced defendant's culpability of these crimes was resolved adversely to defendant under another properly-given instruction. (See *People v. Wright* (2006) 40 Cal.4th 81, 98-99 [where the issue was resolved adversely to defendant under other instructions properly given, there was no prejudice in failing to give defendant's requested instruction].) Here, the court instructed pursuant to CALCRIM No. 3428 regarding mental illness: "You have heard evidence that the defendant may have suffered from -- from a mental illness. You may consider this evidence only for the limited purpose of deciding whether at the

8

time of the alleged crimes, the defendant acted with the required specific intent or mental state." "Mental illness . . . can reduce murder to involuntary manslaughter where intent to kill is not present due to mental illness . . . . If you determine premeditation and deliberation and lying in wait are not present due to mental illness . . . , then the defendant cannot be found guilty of first-degree murder." "If you find due to mental illness . . . the defendant did not intend to kill, then the killing would be involuntary -- involuntary manslaughter. The prosecution has the burden of proving beyond a reasonable doubt that a defendant acted with the required mental state."

And second, the parties argued about defendant's mental illness at length in closing statements, highlighting the evidence regarding hallucinations and why it did or did not affect the outcome of this case.

The prosecutor argued about why defendant "was never acting because of his mental illness at the time he committed the crimes." While individuals with schizophrenia suffer from hallucinations, defendant did not testify that "I was having a hallucination" when he killed his aunt, nor did he present evidence he was suffering from "visual hallucinations."

Defense counsel responded by arguing in closing that "we know he has a psychotic illness" and defendant's "mental state . . . that's why we're here." Defense counsel then went through the "circumstantial evidence" of defendant's "mental state at 5:30 a.m. [on] June 8th, 2012." "In January, he gets on his internet, and he types in 'paranoia, hearing voices.' Something is wrong." "[T]owards the end of February . . . [h]e calls [his sister], tells her he's going to Washington D.C., because . . . he helped create this game Skyrim which is evidently . . . the most popular game in 2011. . . . And he later tells [his sister] that Peter Jackson knighted me, dubbed me, " 'Cody the Blue.' " "We're seeing that [defendant] is starting to have some delusional thoughts. He's starting to have hallucinations, and . . . the doctor talked about they can be auditory. They can be visual and even olfactory . . . ." "Now, during March, he's sleeping in [his friend]'s

9

closet because his room smelled bad . . . ." "[S]chizophrenia is, it's a psychotic disorder" and the "symptom[s] [include] delusions, . . . hallucinations and disorganized thought or behavior . . . ." "[T]his is a chronic disease that has periods of waxing and waning psychotic symptoms."

In rebuttal, the prosecutor argued that "defendant talks about hearing voices" and then in the interview talks about "impulses or competing interest or urges." But "[h]e made that choice, that conscious choice to walk down that hallway and do that act with this knife (indicating) and then take this knife and walked down the hallway and attack Lynn Watson with the same knife he had just killed Lynn Watson's wife with."

Given that the issue of defendant's hallucinations was clearly put forth by the parties and resolved adversely to defendant under CALCRIM No. 3428 regarding mental illness that included hallucinations, the error in not giving defendant's instruction regarding hallucinations was harmless.

II

*Viewed As A Whole, The Court's Preinstruction During Voir Dire*
*Did Not Interfere With Defendant's Presumption Of Innocence*
*And Did Not Shift The Burden Of Proof To Defendant*

Defendant contends the trial court erroneously instructed the jury during voir dire that he was guilty of first degree murder and attempted murder and shifted the burden of proof to him. We disagree, reviewing the instructions as a whole. (See *People v. Cross* (2008) 45 Cal.4th 58, 67 [the correctness of jury instructions is determined by reviewing the instructions as a whole, not just an isolated instruction or part thereof].)

A

*The At-Issue Instruction*

The instruction about which defendant complains (italicized below) came after defense counsel told the jury during voir dire that defendant did the "horrible thing[s]" here and he was "responsible for that," but that the defense was going to "explain to [the

10

jury] what crimes [defendant] is actually guilty of." These remarks prompted a prospective juror to ask, "How can I find somebody not guilty who has -- whose lawyer has said he did it?" The court responded as follows:

"Just to clear up some of the mystery here . . . . [¶] Crimes . . . are composed of two different things. There are the acts necessary to commit the crime, and then there is what we refer to as a mental state. So, you have the acts required, and then you have to have a mental state, and those two things have to concur. In other words, they have to exist at the same time together.

"*Now, [the prosecutor] is going to offer to you evidence and information that will cause you to believe that [defendant] had certain mental states necessary for a conviction of premeditated, deliberate, first-degree murder, and the acts can be informative on whether or not those mental states existed*, but they may not be the only information that you hear on whether or not these mental states existed.

"[Defense counsel] may offer you other evidence to have you think about other possible mental states that either did or didn't exist at the time the acts themselves were committed. And so you -- it isn't as simple as saying someone did the acts that caused the event. There has to be that second component, the mental state that has to exist at the very same time the acts are being committed. Okay?

"For instance . . . [the prosecutor] has filed charges . . . accusing [defendant] of having not only committed murder but that it was premeditated, deliberate, first-degree murder. Premeditation and deliberation are mental states that have to exist at the time the killings occurred. And if they don't exist or if there is a reasonable doubt about them existing, then you -- you may not find that the killing, if it occurred, was premeditated and deliberate. There may be other mental states that were in play that caused the killing to be a different kind of crime, but unless you find beyond a reasonable doubt that the killings were premeditated and deliberate as I define those terms to you, then you cannot

11

find that true beyond a reasonable doubt. You can't find first-degree murder, in other words."

As voir dire continued, a prospective juror said she had "shut out" the details of "how the victims were murdered" because she did not "normally like to listen to stuff like that."

Moments later, the court stated as follows:

"I just want to make it clear, whether [defendant] murdered someone remains to be seen. I think in thinking back about [defense counsel's] statements to you yesterday, what [defense counsel] acknowledged and yet is still a matter of proof for [the prosecutor] is that . . . there is what we would refer to as a homicide. He's acknowledged that there was a homicide in this case. Homicide is simply the killing of one human being by another.

"Now, what kind of homicide it is or was, that's in [defense counsel]'s estimation what this trial is largely going to be about because types of killings of one human being by another can come in different varieties, and we'll -- we'll hear more as the trial goes on, and I'll give you instructions on various types of homicides that may or may not apply in this case, and it is on the basis of those legal instructions that you'll be expected to decide the outcome, and I just wanted to make that clear."

B

*The Court's Preinstruction Did Not Interfere With Defendant's*
*Presumption Of Innocence And Did Not Shift The Burden Of Proof*

Defendant claims that the trial court erred by instructing the jury that the prosecutor "is going to offer to you evidence and information that will cause you to believe that [defendant] had certain mental states necessary for a conviction of premeditated, deliberate, first-degree murder." He argues that the instruction "amounted to a presumption that [he] was guilty of first degree murder (count one) and attempted

12

first degree murder (count two) and shifted the burden to [him] to prove otherwise -- i.e., to present affirmative evidence proving reasonable doubt."

The problem with defendant's argument is that it artificially isolates that one statement and fails to consider the effect of that statement in light of the rest of the court's instructions regarding the People's burden of proof, which is how we must view any claim of instructional error on appeal.  (*People v. Cross*, *supra*, 45 Cal.4th at p. 67.) The court's instruction as a whole conveyed the correct law that defendant was presumed innocent and that the People had the burden to prove him guilty beyond a reasonable doubt.  After making the statement about which defendant complains, the court stated that if "[p]remeditation and deliberation . . . don't exist or if there is a reasonable doubt about them existing, then you -- you may not find that the killing, if it occurred, was premeditated and deliberate.  There may be other mental states that were in play that caused the killing to be a different kind of crime, but unless you find beyond a reasonable doubt that the killings were premeditated and deliberate as I define those terms to you, then you cannot find that true beyond a reasonable doubt.  You can't find first-degree murder, in other words."  As voir dire continued, the court made "clear, whether [defendant] murdered somebody remains to be seen."  Later, after jury selection, the court gave the standard jury instructions that "[a] defendant in a criminal trial is presumed innocent" which "requires that the People prove a defendant guilty beyond a reasonable doubt."  Accordingly, there is no merit to defendant's argument that the court's instructions made the jury presume defendant was guilty and shifted the burden of proof to him.

## III

*Defense Counsel Was Not Ineffective In Closing*

*Argument Because His Statements About His Role As Casting*

*Doubt On The Prosecutor's Theory Were Correct Statements Of Law*

Defendant contends "defense counsel performed deficiently in closing by arguing that appellant was tasked with casting doubt on the prosecution's theory and the elements." We disagree.

During closing argument, defense counsel argued as follows:

"And I know the evidence in this case is -- is maybe . . . befuddling at times, and we're all looking for answers, and I don't know if the evidence provided answers, but what we do know is we're here because the prosecution has to prove this case beyond a reasonable doubt. That's their task. Our task is to tell you why there's not (sic) reasonable doubt."

A little while later in closing, defense counsel argued as follows:

"Now, like I said, the prosecution needs to prove all these things beyond a reasonable doubt. [Defendant] is presumed innocent. So, you can't get to first-degree murder without being convinced beyond a reasonable doubt that that's what happened. And each crime has elements. All right? And they are kind of - - on the jury instruction, you'll see one, two, three . . . . And that's the People's task is to prove these cases -- these charges beyond a reasonable doubt.

"The defense you know, we're tasked with casting a doubt on the prosecution's theory, and as to the elements and charges, the defense is not required to provide the answers. And I think we all can see from the evidence, we can't provide the answers. We don't have the answers. We can give you general information, and you can use that with your own common sense, the rest of the evidence and the jury instructions."

14

Defense counsel was not deficient because his arguments were correct statements of law. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693] [deficient performance is the first prong of an ineffective assistance of counsel claim].) "[T]he *prosecution* must prove every element of a charged offense *beyond* a reasonable doubt. The accused has *no* burden of *proof* or *persuasion*, even as to his defenses. [Citations.] However, once the prosecution *has* submitted proof that permits a finding beyond reasonable doubt on every element of a charge, the accused may obviously be obliged to respond with evidence that 'raises' or permits a reasonable doubt that he is guilty as charged." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1214-1215.) Defense counsel reasonably may have concluded that the evidence presented by the prosecutor could have proved defendant guilty of the crimes beyond a reasonable doubt, so now his job in closing argument was to explain how he had responded with his own evidence or argument that raised a reasonable doubt as to defendant's guilt. As explained in *Gonzalez*, this was an accurate statement of law.

IV

*There Are No Multiple Errors To Accumulate*

Defendant argues his contentions must be evaluated for their cumulative effect. Because we have found only one error, we reject defendant's contention that the "errors" he has alleged "must be evaluated for their cumulative effect."

## V

*We Strike The One-Year Deadly Weapon Enhancement Attached To*

*The Attempted Murder Count And The Three-Year Great Bodily Injury*

*Enhancement Attached To The Assault With A Deadly Weapon Count*

*Because The Jury Never Found Those Enhancements True*

Defendant contends we must strike the sentences the court imposed for using a deadly weapon (Pen. Code,[1] § 12022, subd. (b) attached to count 2, which was attempted murder, and for inflicting great bodily injury (§ 12022.7) attached to count 3, which was assault with a deadly weapon, because the jury never found them true.  The People correctly concede this error.  Although the operative information alleged these enhancements, the jury never was asked to find them true.  Nevertheless, the court imposed a one-year term for using a deadly weapon attached to the attempted murder count and a stayed three-year term for inflicting great bodily injury attached to the assault with a deadly weapon count.  We strike those enhancements and attached sentences and order the trial court to modify the abstract of judgment accordingly.

## VI

*The Abstract Of Judgment Contains A Clerical Error That Must Be Corrected*

Defendant was found guilty of attempted first degree murder.  (§§ 187, 664.)  But the abstract of judgment refers to a conviction for "187/667."  The abstract of judgment must be corrected to reflect a conviction for "187/664."

## DISPOSITION

The one-year sentence imposed for using a deadly weapon (§ 12022, subd. (b)) attached to count 2, which was attempted murder, and the three-year stayed sentence for

---

[1]     Further section references are to this code.

16

inflicting great bodily injury (§ 12022.7) attached to count 3, which was assault with a deadly weapon, are stricken.

As modified the judgment is affirmed.

We direct the trial court to modify the abstracts of judgment in the following three respects:  for abstract CR-292:  (1) in box 1, the reference to "SECTION NO." in count "A2" should be changed from "187/667" to "187/664"; (2) in box 2, in the row for count "A2," delete "PC 12022(b)  and "1" and change the "TOTAL" box from "4" to "3"; (3) and for abstract CR-290, in box 2, delete "3" "PC 12022.7" and "3-STAYED."


                                                _____ROBIE_____, J.


We concur:


____BLEASE_____, Acting P. J.


____MURRAY_____, J.


17